NO. PD-1173-15

_____

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

MICKEY LEE BATES

V.

THE STATE OF TEXAS

ON DISCRETIONARY REVIEW FROM THE

COURT OF APPEALS FOR THE

SIXTH JUDICIAL DISTRICT OF TEXAS

CAUSE NUMBER 06-14-00096-CR

APPEALED FROM THE

SIXTH DISTRICT COURT

OF LAMAR COUNTY, TEXAS

CAUSE NUMBER 25346

PETITION FOR DISCRETIONARY REVIEW

Gary L. Waite
State Bar No. 20667500
104 Lamar Ave.
Paris, Texas 75460
Telephone (903) 785 - 0096
Fax: (903) 785-0097

ATTORNEY FOR THE PETITIONER

RECEIVED IN
COURT OF CRIMINAL APPEALS

September 30, 2015

ABEL ACOSTA, CLERK

LIST OF PARTIES
APPELLANT
MICKEY LEE BATES

ATTORNEY FOR THE APPELLANT AT TRIAL
DIANE SPRAGUE
ATTORNEY AT LAW
9 W. Houston Street
Paris, Tx 75460
Tel: 903-249-6271
Fax: 903-782-9771

ATTORNEY FOR APPELLANT ON APPEAL
GARY L. WAITE
104 LAMAR AVE.
PARIS, TEXAS 75460
Tel: 903 - 785 - 0096
Fax: 903-785-0097

APPELLEE;
THE STATE OF TEXAS
JILL DRAKE
ASSISTANT COUNTY ATTORNEY
119 NORTH MAIN STREET
PARIS, TEXAS 75460
903-737-2413

ELECTED DISTRICT AND COUNTY ATTORNEY
GARY D. YOUNG
119 N. MAIN
PARIS, TEXAS 75460
903-737-2413

TABLE OF CONTENTS

LIST OF PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii-iv

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . v

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

STATEMENT OF PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ABBREVIATIONS AND REFERENCES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

GROUNDS FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2-3

GROUND   ONE (Restated). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

The Court of Appeals, having found that it was error to admit  a sound recording before the jury erred in it's finding that the admission of these recordings was harmless beyond a reasonable doubt.

GROUND   TWO (Restated) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . 3

 The Court of Appeals, having found  that appellant was denied his right  to confront the witnesses against him including the right of physical presence of the witness before the jury, erred in it's finding that these serious constitutional errors were harmless beyond a reasonable doubt.

REASON FOR REVIEW AND ARGUMENT UNDER GROUND
 ONE AND TWO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3-5

GROUND  THREE (Restated) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . .5-6

 The Court of Appeals, having found  that the trial court erred in admitting into evidence statement made to officers by the appellant while under arrest was a  violation of Miranda,  erred in it's finding that the  error was harmless beyond a reasonable doubt.

REASON FOR REVIEW AND ARGUMENT  UNDER GROUND  THREE . . . . . . . . . . . . .. 6-7

 CONCLUSION AND PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . .8

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

APPENDIX A - COURT OF APPEALS OPINION

# INDEX OF AUTHORITIES

## CASES

Crawford v. Washington, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Dowthitt v. State, 931 S.W. 2d 244 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . .7

Miranda v. Arizona, 384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 6

Scott v. State, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007. . . . . . . . . . . . . . . . . . . . . . . . . .5

Snowden v. State, 353 S.W. 3d 815, 822 (Tex. Crim. App. 2011). . . . . . . . . . . . . . . .. . . . . . . . .6-7

## RULES AND STATUTES

Tex R. App. P. 44.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Tex R. App. P. 66.3 (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3,6

<u>NO. PD-1173-15</u>

TO THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

MICKEY LEE BATES, PETITIONER

V.

THE STATE OF TEXAS, RESPONDENT APPELLANT'S

PETITION FOR DISCRETIONARY REVIEW

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the Petitioner, Mickey Lee Bates, and respectfully urges this Court to grant his Petition for Discretionary Review of the above styled cause, pursuant to the rules of the Court.

<u>STATEMENT REGARDING ORAL ARGUMENT</u>

Petitioner believes that oral argument would assist the Court in explication and disposition of the issues presented in this petition, and presents unique and interesting issues. Therefore, Petitioner respectfully requests oral argument.

<u>STATEMENT OF THE CASE</u>

Appellant was charged by indictment with the offense of Aggravated Assault with a Deadly Weapon, a second degree felony, enhanced by one prior conviction, in Cause No. 25346, in the 6th District Court of Lamar County, Texas (Clerk's Record [CR], p. 7). After a jury trial, he was sentenced to ten (10) years in the Institutional Division, Texas Department of Criminal Justice (TDCJ) on April 24, 2014 ( CR, pp. 55-56).

Appellant gave timely notice of appeal, filed with the clerk on May 7, 2014 (CR, p. 58). Appellate counsel was appointed by the trial court on May 13, 2014 (CR, p. 59).

The Court of Appeals affirmed the conviction on June 17, 2015. Appellant filed a Motion for Rehearing which was overruled on August 11, 2015.

## STATEMENT OF PROCEDURAL HISTORY

(1)Date of opinion from Court of Appeals: June 17, 2015

(2)Date of Motion for Rehearing: July 31, 2015

(3)Date Motion for Rehearing Disposed August 11, 2015

(4)Motion for Extension of Time to File
 Petition for Discretionary Appeals September 9, 2015

(5)Petition for Discretionary Review Due: October 12, 2015

## ABBREVIATIONS AND REFERENCES

The Reporter's Record (RR) is referenced by volume (vol) page (p); line (l) as follows: (RR, vol 3, p 171, l. 24).

The Clerk's Record(CR) is referenced by page (p) as follows (CR, pp. 9-10)

The Court of Appeals Opinion is referenced as Slip Op., then page number (e.g. Slip Op., p. 16).

## GROUNDS FOR REVIEW

GROUND ONE

The Court of Appeals, having found that it was error to admit a sound recording before the jury erred in it's finding that the admission of these recordings was harmless beyond a reasonable doubt.

GROUND TWO

 The Court of Appeals, having found that appellant was denied his right to confront the witnesses against him including the right of physical presence of the witness before the jury, erred in it's

2

finding that these serious constitutional errors were harmless beyond a reasonable doubt.

GROUND   THREE

The Court of Appeals  is correct in it's finding  that  trial court erred in admitting into evidence statement made to officers by the appellant while under arrest in violation of Miranda.   However, the Court erred in it's finding that the serious constitutional error was harmless beyond a reasonable doubt.

## GROUND  ONE (RESTATED)

The Court of Appeals, having found that it was error to admit  a sound recording before the jury erred in it's finding that the admission of these recordings was harmless beyond a reasonable doubt.

## GROUND  TWO (RESTATED)

The Court of Appeals, having found  that appellant was denied his right  to confront the witnesses against him including the right of physical presence of the witness before the jury, erred in it's finding that these serious constitutional errors were harmless beyond a reasonable doubt.

## REASON  FOR  REVIEW  AND ARGUMENT  UNDER GROUNDS  ONE  AND TWO

The Court of Appeals has decided an important question of state and federal law that conflicts with the applicable decisions of the Court of Criminal appeals and the Supreme Court of the United States. (Texas Rules of Appellate Procedure, Rule 66.3 (d) ).

The Court of Appeals correctly held that "the witness statements recorded on the police dash cam were testimonial, and their admission to evidence was error.  As this was a violation of a constitutional protection, we must reverse Bates' conviction unless we can determine beyond a

3

reasonable doubt that the error neither contributed to Bates' conviction nor his punishment." See Tex R. App. P. 44.2(a). (Slip Op at 12 ). The Court then determined the error and the "Miranda" error, argued under Ground for Review three, were harmless beyond a reasonable doubt. For the reasons set forth, the Court's harmless error analysis was wrong.

The Court of Appeals did not consider the mob atmosphere depicted in the video and audio of state's Exhibit 3. Johnny Bangs, a Paris police officer testified that he responded to a call to 510 Bonham St, Paris on July 19, 2014. He activated his in car video and audio when he got the call (RR, vol 3, p. 35, l 21-p. 36, l 6). The video was admitted over appellant's objection that there were people making statements that could be witnesses subpoenaed, and that Appellant was being questioned without any Miranda warning. (P. 38, ll 6-8; exhibit 3 ). Appellant's attorney also argued that the video was more prejudicial than probative. The state argued that it was officers "trying to figure out what was going on." The trial court overruled the objection (RR, vol 3, p. 32 l. 22- p.33, l. 19).

The video depicts a man stating "he tried to kill that man," and angrily saying "Don't let him go anywhere, I'm going to do something stupid:" and, "he ran over that old man." (Exhibit 3, Bangs video at time of 20.45; hereafter designated by time numbers on video). At the same time an unidentified woman is heard to say "Oh my God." It is followed by the officer talking to Appellant, and Appellant stating that the truck wouldn't stop. He stated he had no weapons. There is a sound of handcuffs being put on defendant. There are conversations off camera of, presumably, emergency medical technicians, talking to complainant. This mob atmosphere is described in detail by the Court of Appeals rendition of the events in the opinion. (Slip op. pp. 5-6).

4

What is obvious, and the Court of Appeals so finds, is that the video/audio statements were testimonial, and the statements contained in the recordings were used by the state to prove it's case. The Court held that the admission of the video and audio of the events was error. Where the Court of Appeals errs is it's conclusion that the statements contained in the recording was harmless, or as put by the majority, "were of no great importance to the state's case." ( Slip op , p. 12). Having said that the state relied upon the recording to prove it's case, the Court then held that the recording was of "no great importance to the state's case."

In making it's harm analysis, the Court of Appeals did not properly follow Scott v. State, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007), and did not properly apply Scott in it's interpretation of Crawford v. Washington, 541 U.S. 36 (2004). This Court, in Scott, states that the emphasis of the harm analysis pursuant to Rule 44.2(a) should not be on the propriety of the outcome of the trial. The question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict–whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.' In reaching that decision, the reviewing court may also consider factors other than those listed. Scott at page 390; Slip Op. P. 12.

It is apparent that the errors pointed out and described in detail by the Court harmed appellant, and it cannot be said, beyond a reasonable doubt, that the recordings did not contribute to appellant's conviction. Based on the foregoing, Appellant requests that the Court grant his Petition for Discretionary Review.

5

GROUND  THREE  (Restated)

The Court of Appeals, having found  that the trial court erred in admitting into evidence statement made to officers by the appellant while under arrest was a  violation of Miranda,  erred in it's finding that the  error was harmless beyond a reasonable doubt.

REASON  FOR  REVIEW  AND ARGUMENT  UNDER  GROUND  THREE

The Court of Appeals has decided an important question of state and federal law that conflicts with the applicable decisions of the Court of Criminal appeals and the Supreme Court of the United States. (Texas Rules of Appellate Procedure, Rule     66.3 (d) ).

Appellant  agrees with the rendition of the facts as set forth in the Court of Appeals  opinion. (Slip Op., pp. 2-4)  However, there is one area where the facts need to be set forth in more detail, and are germane to this particular issue. On page six of the Court's opinion the Court  states "After talking to witnesses, the voices of the officers are heard conversing with one another, but their conversation is mostly indecipherable, although the word 'arrest' is clearly audible at some point during these discussions." ( Slip op. p. 6.) There is more discussion after this than is apparent by the Court's rendition of the facts.  After the officers discussion of the imminent arrest of Appellant, without giving Miranda  warnings, the officer interrogates Appellant about the accident. Miranda v. Arizona, 384 U.S. 436 (1966) (See Exhibit 3, video at time 2053-2057)   The Miranda violation is more egregious than the opinion's facts suggest.   The Court states in it's opinion that the erroneous admission of the evidence was not in the nature of a confession. However, appellant is handcuffed and seated in the back seat of the patrol car, and had been for several minutes when this was occurring. The berating of appellant by the officers for suggesting that he did not do anything to help Whitlock was harmful.  (Exhibit 3, video time 2053-2057).  The

6

accusatory questions and the responses of the appellant were harmful to appellant. It suggests that he callously left Whitlock under his truck and did nothing to help him. It cannot be said, beyond a reasonable doubt, that this did not cause harm the Appellant and contribute to his conviction or punishment. Snowden v. State, 353 S.W. 3d 815, 822 (Tex. Crim. App. 2011). See also Dowthitt v. State, 931 S.W. 2d 244, 254 (Tex. Crim. App. 1996). Based on the foregoing, Appellant requests that the Court grant his Petition for Discretionary Review.

PRAYER

Appellant prays that this Honorable Court grant this Petition for Discretionary Review, and after full briefing on the merits, that the case be set for submission to the Court of Criminal Appeals, and that after submission, this Court reverse the decision of the Court of Appeals.

Respectfully submitted,

Gary L. Waite
Attorney for Appellant
104 Lamar Ave.
Paris, Texas 75460
Tel. 903/785-0096
Fax.903/785-0097


By: /s/Gary L. Waite
Gary L. Waite
SBN 20667500



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00096-CR

_____

MICKEY LEE BATES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 25346

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley
Concurring Opinion by Justice Burgess

# OPINION

Mickey Lee Bates rammed his Ford pickup truck into the porch of his neighbor's apartment, pinning his neighbor, Tommy Whitlock, between the truck and the detritus of the destroyed porch. As a result of this conduct, Bates was charged with aggravated assault with a deadly weapon. A jury convicted Bates of the charge, and he was sentenced to ten years' confinement. Appealing the conviction, Bates raises several challenges to the audio portion of a audio/video recording which was admitted to evidence. This recording allowed the jury to hear both the statements of witnesses and statements by Bates as given to investigating officers at the scene. In addition to his complaints about the admission of the audio/video recording, Bates also claims his trial counsel was constitutionally ineffective.

Although we concur with Bates' claim that some of the evidence from the recording was admitted in error, we find the error harmless beyond a reasonable doubt. We also find that Bates has failed in his burden to demonstrate that his trial counsel provided ineffective assistance. We, therefore, affirm the trial court's judgment and sentence.

## I.    Factual Circumstance

At the time of the events giving rise to the assault charge, Bates was staying in an apartment with James Dunagan in Paris. The apartment complex appears to be a collection of small frame buildings rather than the contemporary, multi-family, multi-story complexes commonly built and seen over the past decades. Dunagan said that in the early evening of July 19, 2013, he was inside

the apartment watching television, while Bates was outside on the porch, drinking Bloody Marys.[1] Bates had previously installed a video camera from which he could monitor his truck in the parking lot, and a small television display of the view from the camera was on or near Dunagan's television set. Through Bates' monitoring device, Dunagan saw Bates get into his truck, appearing to be ready to leave the premises. This concerned Dunagan because he believed the amount of alcohol he had witnessed Bates consume that day would impair Bates' ability to drive. Walking onto the porch, Dunagan observed Bates first back up the manual transmission truck and then lunge forward over a concrete curb stop and across something of a courtyard where he slammed the truck into the front porch of Whitlock's apartment. Whitlock (an older man) and J.D. Duncan, a friend of Whitlock's, were sitting on Whitlock's porch. Duncan, seeing the rapidly-approaching truck, was able to evacuate the porch before the collision, but Whitlock was not. Dunagan testified that after smashing into Whitlock's porch, Bates backed up his truck and proceeded to slam into the porch a second time. After this second collision, Bates' truck became entangled with the debris from the porch, and Bates could not extricate it. Bates turned off the key and started to walk away. A neighbor of Dunagan's took Bates by the arm and led him to a chair on Dunagan's front porch, where Bates sat until the police arrived.

Whitlock corroborated Dunagan's description of events. Whitlock stated that he and Duncan were sitting on Whitlock's porch having a drink. He indicated that Bates and Duncan had recently argued regarding "something about somebody owed somebody or something." Whitlock

---

[1] Dunagan testified that Bates drank most of "a fifth of vodka." In this context, "a fifth" is usually understood to mean one fifth of a U.S. gallon or 757 milliliters. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 466 (11th ed. 2006).

believed that Bates and Duncan were not getting along very well that day. Whitlock testified that he watched as Bates got into his truck, backed the truck down what he described as a long driveway, and then sped forward (sounding like a "tornado"), smashing into Whitlock's porch. Whitlock then described Bates backing up and ramming the porch a second time. This second collision caused Whitlock to be pinned between the door of his apartment and the front of Bates' truck. Whitlock stated that while he was trapped between his apartment and the truck, Bates put the truck in reverse and attempted to back up (Whitlock believing that he intended to back up and run into the porch a third time), but by this juncture, the truck was entangled in the debris and could not be moved.

As a result of the incident, Whitlock sustained a broken leg, a broken rib, and abrasions, and he required daily home health care for a brief period. As a long-term consequence, he found it necessary to use a cane much more frequently than he had in the past. Whitlock was the named victim in the indictment; the State alleged, and the jury found, that Bates used or exhibited the pick-up truck as a deadly weapon.

## II.    Controversy Over Admission of Audio/Video Recording

Three of the four points of error raised by Bates on appeal deal with the introduction of an audio/video recording introduced by the State. This recording, admitted as State's Exhibit 3, was captured by a dashboard camera (dash cam) in one of the responding police officers' cars. There are three points of error we must address concerning admission of this recording, each having to do with the admissibility of the audio portion of the recording and with Bates' statements recorded on it.

4

The recording commences with the travel of the patrol car to the scene and continues after the patrol car comes to a stop in the parking lot of the apartment units. The audio portion records the statements of several witnesses at the scene, as well as comments made by Bates in response to questions posed to him by the police who appeared at the scene. Almost immediately after the policeman exits the patrol car, a burly, shirtless man approaches him and says, "[H]e just tried to kill that man." A woman's voice is recorded as saying, "Oh, my God." The burly man appears to be quite agitated and excited, pacing back and forth in front of the patrol car, and tells the policemen, "Get him man. Get him. Don't let him go nowhere 'cause I'm gonna do something stupid." Although some of the audio portion of the recording is somewhat unintelligible, it appears that the burly man says the name "Mickey Bates."

Immediately after this exchange, one of the officers (who is outside the range of the camera) says, "Come here; what's the deal, man?" Almost assuredly, this question was directed at Bates, because the speaker responds, "Man, I started my truck up and put it in gear and let out on the clutch and it took off and I couldn't stop it and it just kept going . . . ain't run over nobody on purpose . . . I swear to God." The officer then asks the speaker (obviously Bates) if he has any weapons on him; and, notably, if he was driving the vehicle. Bates responds with what sounds like, "I cranked it . . . ." Shortly, the sound of handcuffs being applied is heard. From witness testimony at trial, it appears that at this point, Bates was handcuffed and put in a police car.[2]

---

[2]Bates does not challenge the admission of this statement; we interpret his argument in his third point of error to challenge admission of the statements he made later, after being handcuffed and put in a police car.

Over the next five or six minutes, the police officers' voices are heard to request that people who were witnesses to the event come talk to them. At least two people are then heard responding to police questioning and by stating that they saw someone drive a truck rapidly into Whitlock's porch, back up, and then repeat the collision. After one of these recitations, one of the officers is heard asking the witness for her contact information.

After talking to these witnesses, the voices of the officers are heard conversing with one another, but their conversation is mostly indecipherable, although the word "arrest" is clearly audible at some point during these discussions. At no point does anyone provide Bates with the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436 (1966). One officer asks Bates (who is then sitting handcuffed in the rear of the patrol car) his name. Bates identifies himself and says that he lives in the apartment complex. A voice apparently belonging to a police officer[3] asks Bates, "What's going on Mickey," and Bates' response (which is difficult to understand) indicates that he had put his truck in the wrong gear "and let out on the gas and . . . couldn't get off of it . . . gas pedal got stuck." The officer then inquired how much alcohol he had consumed, and Bates responded that he had not had much. When Bates was asked if he knew Whitlock, he responded in the affirmative and volunteered that he would never intentionally hurt the man, maintaining that the collision had been the result of an accident. When asked if he had tried to help Whitlock, Bates answered that he had been knocked unconscious by the collision.

---

[3]This voice sounds different than the voice that asked the earlier question, but none of the speakers, other than Officer Chad Brakebill, were identified on the recording.

6

After talking to Bates, the police officers are heard talking, apparently out of Bates' hearing. One officer asked, "We're gonna get him for assault, right?" Another officer responds affirmatively, saying Bates would be charged with aggravated assault with a deadly weapon. Within two minutes thereafter, an officer is heard telling Bates he was under arrest for "assault with a deadly weapon."

## A.     Confrontation Clause

Bates' first two points of error are directed at the admission of the video recording. The first point claims error in the admission of the audio portion of State's Exhibit 3 "before the jury without the proper predicate."[4] Bates' second point of error complains that its admission was in error because Bates had a right "to confront the witnesses against him. This includes the right of physical presence of the witness before the jury and the defendant without the defendant's having to call the witness." Even so, the body of Bates' brief concentrates on addressing hearsay and confrontation of witnesses, attempting to address these two points in a single section of argument. We first look to Bates' trial objections to consider what argument or arguments have been preserved for our review.[5]

When the State sought to offer State's Exhibit 3, the following objection and discussion occurred:

---

[4]If by his phrase "sound recording admitted without predicate" Bates intended to object to the recording of his voice without first satisfying the requirements of Article 38.22, Section 3 of the Texas Code of Criminal Procedure, he does not discuss, analyze, or argue this in his brief. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2014). As explained below, we treat Bates' arguably multifarious objection as preserving only a Confrontation Clause complaint.

[5]"[P]reservation of error is systemic and must be considered, regardless of whether the issue is raised by the parties." *Flowers v. State*, 438 S.W.3d 96, 106 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Gipson v. State*, 383 S.W.3d 152, 159 (Tex. Crim. App. 2012)).

[Defense Counsel]: I'm objecting to this DVD being played with the audio because there are people on there that are making statements that could be witnesses subpoenaed here. These people -- and also the defendant is questioned without any Miranda warning on his way to the hospital; therefore, it is more prejudicial than probative.[6]

Now, I don't mind it if it's just what you see but it's this conversation.

[The State]: This is officers responding to a 911 -- three 911 calls. We're offering it for the purpose of the present sense impression, any excited utterance. The defendant was not under arrest when he was questioned. They're trying to figure out what was going on. There is another officer video where they do take the witnesses in front of the car and question them. That's Officer Mitchell's video. We're not going to offer that into evidence. This just relates to the officers arriving on the scene, trying to find out what is going on and trying to find out from Mr. Bates what happened.

THE COURT: I'm going to overrule your objection.

[Defense Counsel]: Could I say something -- respond? First, when they get there, there is a man going on -- giving -- telling what he saw.

[The State]: This is the officer's present sense impression, trying to figure out what's going on.

THE COURT: I'm going to allow it. I think you can do it.

[Defense Counsel]: All right.

It is quite apparent that the State must have believed the nature of Bates' objections to be directed

to complaints about the hearsay nature of the evidence. However, we find that the first part of the

objection (which refers to "people on there that are making statements that could be witnesses

---

[6]We treat this passage as presenting two objections, the first of which deals with the audio-recorded statements of witnesses as heard on State's Exhibit 3 and the second which deals with Bates' oral statements being recorded and offered to evidence without his having first been given *Miranda* warnings. *See Miranda*, 384 U.S. 436. As for the contention that Bates' statement was "more prejudicial than probative," that statement is too vague to present a proper objection. There is no indication Rules 403 or 404(b) of the Texas Rules of Evidence were at issue or being discussed, and a weighing of probative value versus potential prejudice arises in other contexts, such as Rule 609 of the Texas Rules of Evidence. *See* Tex. R. Evid. 609.

subpoenaed here," as well as counsel's later statement) that "[f]irst, when they get there, there is a man going on -- giving -- telling what he saw" raise an objection to Bates' inability to confront potential witnesses against him. We will treat Bates' first objection as one raising his rights under the Confrontation Clause of the United States Constitution. *See* U.S. CONST. amend. VI.

The United States Constitution's Confrontation Clause "restricts the introduction of out-of-court statements . . . in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 131 S.Ct 1143, 1155 (2011). Such statements are testimonial in that the testimony they present is characterized as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Testimonial statements are precluded from admission at trial, under the authority of the Sixth Amendment, unless the declarant is unavailable and the opponent of the statement has had a prior opportunity to cross-examine the declarant. *See id.* at 68 ("Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination.").

The parameters of testimonial versus non-testimonial statements are still evolving. Helpful to our analysis is the following, from the United States Supreme Court:

> Statements are non[-]testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

9

*Davis v. Washington*, 547 U.S. 813, 822 (2006). In *Davis*, the statements at issue were from a 9-1-1 emergency call. The declarant caller "was alone, not only unprotected by police . . . but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. [Her] present-tense statements showed immediacy." Thus, the statements were non-testimonial. *Id.* at 831. A different result was reached in *Davis'* companion case, *Hammon v. Indiana*. There, the victim's

> narrative of past events [] delivered at some remove in time from the danger she described . . . were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, [and] the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial.

*Id.* at 832. *Hammon*'s statements were testimonial.

The United States Supreme Court expounded upon the differences in the *Davis* and *Hammon* statements in *Bryant*. In that case, officers responded to a reported shooting where they found the victim bleeding in the parking lot of a gas station. While the victim told them he had been shot, and may have identified the shooter, the Court took note that nothing the victim told officers explained the reason for the shooting, where the shooter was, whether the declarant believed that he might return, etc. *See Bryant*, 131 S.Ct at 1163–64, 1166. Discussing *Davis*, the Court took note that part of the consideration in *Davis* and its companion, *Hammon*, had been whether the two victims of domestic violence remained in danger, something that would constitute an ongoing emergency. (Reiterating, we note that in *Davis*, the victim called while Davis was assaulting her, but in *Hammon*, the danger had passed; the victim told officers "things were fine," and "there was no immediate threat to her person." *Davis*, 547 U.S. at 830). The testimonial analysis should consist of an objective evaluation of the primary purpose of the statement in

10

question considering things like the existence *vel non* of an emergency and the formality of the statement. *Bryant*, 131 S.Ct at 1160. We look objectively at the "statements and actions of the parties [that is, the questioner and the declarant] to the encounter, in light of the circumstances in which the interrogation occurs." *Id.* at 1162.

In the case at bar, although the police officers were initially responding to an emergency, it seems clear that the immediate danger had passed. Even though it appears that Whitlock was still pinned between Bates' pick-up truck, the debris from his porch, and his apartment, and even though emergency responders were still arriving and dealing with the situation, there was no indication that anyone other than Bates was the perpetrator of the assault. There was no danger that Bates would abscond, he acted alone, he quickly acquiesced to law enforcement's authority, and he posed no danger to those around him. Even the excited burly man seen on the recording shortly after the police arrived was describing events that had already occurred, even though recently;[7] the other witnesses heard being interviewed by the police all spoke in the past tense, describing what they had just seen. In the context of the events on the ground, officers were gleaning information concerning an apparent crime which had been completed, and neither the police, nor the victim, nor any of the witnesses were under a prospect of further danger that their words could operate to affect. "Objectively viewed, the primary, if not indeed the sole, purpose

---

[7]That a statement may qualify as an excited utterance (*see* TEX. R. EVID. 803(2)) "does not alter its testimonial nature." *Wall v. State*, 184 S.W.3d 730, 745 (Tex. Crim. App. 2006). Although the State argues that at least some of the witness' statements recorded in State's Exhibit 3 qualified as excited utterances, we do not get to that discussion, because the first part of Bates' trial objection, quoted above, did not make specific complaints about hearsay and confrontation. We have treated his objection as one to confrontation. Discrete objections are required to preserve hearsay and confrontation complaints, individually. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005).

11

of the interrogation[s] was to investigate a possible crime . . . precisely what the officer[s] should have done." *Davis*, 547 U.S. at 830.

The witness statements recorded on the police dash cam were testimonial, and their admission to evidence was error. As this was a violation of a constitutional protection, we must reverse Bates' conviction unless we can determine beyond a reasonable doubt that the error contributed neither to Bates' conviction nor his punishment. *See* TEX. R. APP. P. 44.2(a).

We consider the following factors in a harm analysis:

> 1) how important was the out-of-court statement to the State's case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and 4) the overall strength of the prosecution's case.

*Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Here, while the witness statements contained in the recording were apparently used by the State in order to prove its case, we find they were not of any great importance to the State's case. Whitlock and Dunagan both testified in detail regarding Bates driving his truck forcefully into Whitlock's porch, backing up, and smashing into it again. Accordingly, the witness statements on the audio/video recording were cumulative of other (much more detailed) evidence properly allowed into evidence. In this same vein, the State had a strong case against Bates (based on Whitlock and Dunagan's testimony) without any of the evidence from the audio/video recording. We find the erroneous admission of the testimonial witness statements contained on State's Exhibit 3 to have been harmless beyond a reasonable doubt.

12

**B.      Bates' Custodial Statement, Without *Miranda* Warnings**

Bates next challenges admission of the portion of State's Exhibit 3 where officers asked him questions about what had occurred that lead to Bates' truck being smashed into Whitlock's porch.[8]  We find that at least some of Bates' statements to police were the result of custodial interrogation and that admission of those statements was error.  We also find, though, that this error was harmless beyond a reasonable doubt.

The warnings required by *Miranda* are triggered when a person undergoes custodial interrogation or, in other words, the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007).  One is in custody, for these purposes, "only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  In *Dowthitt*, the Texas Court of Criminal Appeals suggested four scenarios wherein a person might be deemed in custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave.

*Id.* at 255.  "[T]he restriction upon freedom of movement [in situations one through three] must amount to the degree associated with an arrest as opposed to an investigative detention." *Id.*

---

[8]Bates never denied, at the scene or at trial, that he owned the Ford pick-up truck found trapped among the detritus of Whitlock's porch.

"[T]he custody determination is based entirely upon the objective circumstances"; the subjective intent of the law enforcement officer and of the defendant are "irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials . . . ." *Id*. at 254.

> We recently summarized characterizations of custodial statements as follows:
>
> "[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *see also Carter v. State*, 309 S.W.3d 31, 35–36 (Tex. Crim. App. 2010) ("Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained."). Custodial interrogation refers to "(1) express questioning and (2) 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). That said, statements made voluntarily and not in response to custodial interrogation are admissible. *Arizona v. Mauro*, 481 U.S. 520, 525–26, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987); *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . ."); *Stevens v. State*, 671 S.W.2d 517, 520 (Tex. Crim. App. 1984); *Hutchinson v. State*, 424 S.W.3d 164, 178 (Tex. App.—Texarkana 2014, no pet.).

*Johnson v. State*, No. 06-13-00129-CR, 2014 WL 3865903, at *2 (Tex. App.—Texarkana Aug. 7, 2014, pet. ref'd) (mem. op., not designated for publication) (footnote omitted).

The first statement given on the audio/video recording by Bates appears to have been made before he was either handcuffed or put in the police cruiser. Within less than two minutes of the police officer having arrived at the scene, at least one person directed the officers' attention to Bates as being the operator of the truck that had smashed into Whitlock's porch. At that time, the policemen asked Bates what was going on at the scene, and Bates responded by saying that he had been in his truck but could not control or stop it. The admission of this statement is not challenged

14

by Bates.[9]   Bates was then told by a policeman to step over to a certain area with another of the officers, and it appears that handcuffs were immediately applied to him and he was put in the rear seat of a patrol car.

About seven minutes later, Bates is again asked questions by the police.  Officer Brakebill testified that he was the officer questioning Bates in this later segment.  Brakebill maintained that despite the fact that Bates was handcuffed and secured in a police car, he was not under arrest at that time.  Rather, according to Brakebill, Bates was just being detained while officers investigated the situation.  Brakebill testified that the *Miranda* warnings were not administered to Bates at that time because he was not under arrest.  Brakebill said that Bates was not being detained because he was under arrest; rather, according to Brakebill, the object of the detention was "[t]o find out his side of the story; what took place, was he, in fact, the person behind the wheel of the vehicle when the incident occurred, what his story was, how he played into this situation . . . ."

The State argues that police were in the midst of an investigative detention with Bates and that Bates was not arrested until after the above conversation with Brakebill.  The State cites *Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002), and *Rhodes v. State*, 945 S.W.2d 115 (Tex. Crim. App. 1997), wherein the Texas Court of Criminal Appeals noted that even where a person was handcuffed and/or secured in a police car, that person was not necessarily under arrest.  "*Terry*[10] provides that a police officer may stop and briefly detain a person reasonably suspected

---

[9]Even if Bates challenged this statement, it would likely have been admissible as, at this point, the officers were engaged in an encounter with Bates, a consensual interaction that Bates could have terminated at any time. *See Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997).

[10]*Terry v. Ohio*, 392 U.S. 1, 22 (1968).

15

of criminal activity in the absence of probable cause to arrest the person." *Balentine*, 71 S.W.3d at 771. In looking at the facts of *Balentine*, upon which the State relies, we find that Balentine was found late at night near an area where there was a report of shots fired. Balentine walked quickly away from, and kept looking over his should at, the responding officer, who stopped Balentine and questioned him. The officer then handcuffed and frisked Balentine, during which search he found a .32 bullet. Although Balentine gave somewhat inconsistent answers to the officer's questions, the officer released him. The next day, officers found a triple homicide in the area where Balentine had been walking, the murder weapon having been a .32 caliber firearm. The State eventually charged Balentine and presented evidence of the bullet found in his pocket the night of the murders. Notwithstanding the officer's handcuffing of Balentine, the stop was held to be an investigative detention, not an arrest. *Id.*

In *Rhodes*, officers followed a suspicious vehicle from which a Crown Royal bag was discarded; later, the defendant, the passenger of the vehicle, was seen dropping a baggy of cocaine. The officer testified that he handcuffed Rhodes based on concerns for the officer's safety—Rhodes was detained in a high-crime area, after dark, and the officer was alone with Rhodes following a car chase. *Rhodes*, 945 S.W.2d at 117. When the defendant was handcuffed and held after the car chase ended, the Texas Court of Criminal Appeals found this was an investigative detention, not an arrest. *Id.* at 118.

The State also relies on *Bartlett v. State*, 249 S.W.3d 658 (Tex. App.—Austin 2008, pet. ref'd). There, following a country music concert at a motorcycle rally, two different groups got into a fight, and the complainant was struck and required medical attention. When officers arrived,

16

tensions were high, and witnesses identified Bartlett as the person who had punched the female complainant in the mouth. The officer who eventually interviewed Bartlett told both Bartlett and his friends that Bartlett would not be arrested that night but (citing officer safety and in light of the tense situation that existed between the two rival groups), the officer handcuffed Bartlett and drove him in a police car to a barn or building on the complex, but away from the crowds (about 2,000 yards away, *see id.* at 665). There he removed Bartlett's handcuffs and told him he just wanted his side of the story. Bartlett gave a written statement, which was later admitted at trial. True to his word, the officer returned Bartlett to his group, and the officers made no arrests at that time. Later, Bartlett was charged with assault. *See id.* The Austin Court of Appeals in *Bartlett* held that the officer conducted an investigative detention. Bartlett was neither in custody nor under arrest at the time he gave his statement. *Id.* at 671.

We note significant differences between the situation in *Bartlett* and that confronting officers at the apartment complex where the issues in this case arose. Law enforcement officers in *Bartlett* were confronted with what had apparently been a melee between two groups at a motorcyclists' gathering which had the potential of escalating to a riot. The testifying officer there made it clear at the time that he handcuffed Bartlett and took him away based on safety concerns. The officer told Bartlett, "[I am taking you away for] our safety," and the opinion suggests he meant both his safety and the safety of Bartlett. *Id.* at 664, 669. It is true that Brakebill said safety was a consideration in securing Bates,[11] but there is nothing in the record, including the

---

[11]Albeit a general consideration, Brakebill testified, "Upon making contact with [Bates] and determin[ing] he was the driver of the vehicle for the investigation to ensue for safety purposes he was placed in handcuffs, advised he was detained, placed in the vehicle for further questioning on the scene prior to any arrest being made." Brakebill did not specify what "safety purposes" were served by this conduct.

audio/video recording, which captured the circumstances facing officers upon their arrival, suggesting the degree of simmering mayhem as described in *Bartlett*.[12] Also, significantly, in *Bartlett*, the officer unequivocally told both Bartlett and his confederates that Bartlett was not being arrested. Rather, the officer made it clear that Bartlett was being removed so the officer could talk to him and that after that, Bartlett would not be arrested that evening. *Id.* at 670–71. When the officer and Bartlett arrived at the separate building, away from the rival motorcycle groups, Bartlett was uncuffed and asked to relate his version of events. When he agreed to give a written statement, the officer left Bartlett alone in the building and retrieved a voluntary statement form from his car.[13] Importantly, also, Bartlett was then advised of his *Miranda* rights, and then he executed a written statement. *Id.* at 665–66. The officer then returned Bartlett to his group. As the officer indicated, Bartlett was not arrested the night of the incident.

The State relies on the following language in *Bartlett*: "Nor do investigative detentions constitute 'custody' in the sense of article 38.22 and *Miranda*. . . . Thus, a valid investigative detention, which is characterized by lesser restraint than an arrest, does not constitute custody." *Id.* at 668. For this last statement (that an investigative detention is not custody), *Bartlett* cited *Berkemer v. McCarty*, 468 U.S. 420, 438–39 (1984). There, an officer saw McCarty weaving in and out of his traffic lane and stopped McCarty. McCarty could not complete a balancing test without falling. The officer decided to charge the driver with a traffic offense and not let him drive

---

[12]The only indication that anything might get out of hand was the burly man's bravado statement that if the police did not apprehend Bates, he might do "something stupid." This is hardly indicative of an oncoming riot.

[13]The only challenged evidence Bartlett sought to suppress was the written statement and photographs taken of Bartlett's hand, showing a tooth mark where he had struck the complainant in the mouth. The initial oral statement, provided before any *Miranda* warning, does not appear to have been challenged or moved into evidence.

18

away, but never formally told him he was being taken into custody. At the roadside stop, McCarty acknowledged recently consuming beers and smoking marihuana. McCarty was taken to the police station where questions about his drug and alcohol use elicited additional statements admitting that he had been drinking beer and smoking marihuana. At no point was McCarty administered *Miranda* warnings. *McCarty* stands for the proposition that one taken into custody, even for a traffic offense, must be provided *Miranda* warnings once he is in custody. *McCarty*, 468 U.S. at 438–40. The section of *McCarty* cited by *Bartlett* for the statement that an investigative detention is not custody discusses the limitations of traffic stops and distinguishes those situations, authorized by *Terry*, from custodial situations. We respectfully find our sister court's statement that investigative detentions are not custody too broad for application in the situation before us.

Although the police officers in this case may have intended to conduct an investigatory detention of Bates, the conduct of that investigation constituted a custodial interrogation. Bates was deprived of his freedom in a significant way by being handcuffed and isolated in a police cruiser. Even if there is no indication Bates was explicitly told he was not free to leave, he was also not told he was not under arrest (*cf. Bartlett*), and he clearly was not free to leave. Officers here created a situation where a reasonable person[14] would believe his "freedom of movement had

---

[14]"The 'reasonable person' standard presupposes an *innocent* person." *Dowthitt*, 931 S.W.2d at 254. This assertion derives from *Florida v. Bostick*, 501 U.S. 429, 437–38 (1991), which rejected "Bostick's argument that he must have been seized because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs. . . . [T]he 'reasonable person' test presupposes an *innocent* person." *Id*. While on a bus, Bostick was approached by law enforcement officers who asked a few questions and then asked if they could search Bostick's bag. In support of this statement, the United States Supreme Court cited *Florida v. Royer*, 460 U.S. 491, 519 n.4 (1983) (plurality op.) ("The fact that [respondent] knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position.") (Blackmun, J., dissenting), and *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) ("This 'reasonable person' standard . . . ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."). So, while a "reasonable person" may presuppose an innocent person,

19

been significantly restricted" to the degree associated with a formal arrest,[15] and officers had probable cause to arrest Bates, based on witness statements they had accumulated. Yet, officers did not tell Bates he was free to leave. Whether the police intended only an investigative detention, Bates was surely in custody at the time police officers handcuffed him, if not before. Admission of his statement given to police after he was in custody was error.

Erroneous admission of a statement which should have been suppressed under *Miranda* is error of constitutional dimension, and we must reverse the conviction unless we determine, beyond a reasonable doubt, that admission of the statement did not contribute to the conviction. *See Coffey v. State*, 435 S.W.3d 834, 843 (Tex. App.—Texarkana 2014, pet. ref'd); *see also* TEX. R. APP. P. 44.2(a).

In conducting a harm analysis of an error involving a constitutional protection, "the question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim.

---

it is still an objective evaluation of whether that person would believe themselves free to go, be they sheep or goat. *See Matthew* 25:32-33; *see also Dowthitt*, 931 S.W.2d at 254–55 ("[T]he custody determination is based entirely upon objective circumstances. [*Stansbury v. California*,] 511 U.S. [318, 323 (1994) (per curiam)]. The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances.").

[15]*See Dowthitt*, 931 S.W.2d at 255.

App. 2011) (quoting TEX. R. APP. P. 44.2(a)). The circumstances to be considered may include, as appropriate, "the nature of the error (e.g., erroneous admission or exclusion of evidence, objectionable jury argument, etc.), whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations." *Id.*

Here, although the nature of the error was the erroneous admission of evidence, the evidence admitted was not in the nature of a confession. Rather, Bates' statement to officers was entirely exculpatory because he claimed the collision of his truck with the front porch of the apartment to have been an accident. Although he admitted driving the truck (which, in some fact situations may have been an issue to be determined at trial), the identity of the driver was not at issue at trial; the only issue at trial was Bates' mental state at the time the collision took place. Other than disputing Bates' claim that the collision was accidental, the State did not emphasize or dwell on Bates' statement. It is quite unlikely that the jury gave much weight to Bates' statement. When one considers the impact of Bates' statement, it provided a means for Bates to place his defensive theory of accident before the jury without his having to take the stand to state it.

Other than the uncontested statement that Bates actually piloted the truck when it struck Whitlock's porch (evidence that was readily available elsewhere), the statement contained no inculpatory elements. The jury heard both Whitlock and Dunagan describe Bates' driving, including that he rammed the porch once, then backed up, and rammed into the structure again. "[C]alculat[ing], as nearly as possible, the probable impact of the error on the jury in light of the

21

other evidence,"[16] we feel confident the erroneous admission of Bates' statement did not contribute to the conviction. *See Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006); *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (considering overwhelming evidence of guilt in assaying harm from constitutional error).[17]

## III.     No Ineffective Assistance of Counsel Shown

Bates' fourth point of error alleges the insufficiency of his trial counsel's representation. Pointing to acts or omissions of his trial attorney, Bates claims these purported errors amounted to ineffective assistance of counsel. We overrule this point of error.[18]

---

[16]*McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001).

[17]Our analysis of this *Miranda* error alerted us to the possibility of an issue involving Articles 38.22 or 38.23 of the Texas Code of Criminal Procedure. In certain situations, the trial court is obligated, even if no request is made, to instruct the jury that it may not consider evidence if the jury finds that evidence was obtained in violation of the laws of the State of Texas or the United States. *See* TEX. CODE CRIM. PROC. ANN. arts. 38.22, § 7, 38.23(a) (West 2005). However, those requirements are only triggered where the evidence raises an issue as to a "genuine factual dispute." *Oursbourn v. State*, 259 S.W.3d 159, 176 (Tex. Crim. App. 2008). For example, if the defendant maintains he involuntarily gave a statement under duress or coercion from law enforcement, but the officer denies the alleged coercive conduct, that might raise a fact issue properly submitted to the jury. *See id.* at 176–77. However, "[t]he jury decides facts; the judge decides the application of the law to those facts." *Madden v. State*, 242 S.W.3d 504, 511 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007) ("Unless otherwise provided in this Code, the jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby.").

However, in this case, there was no disputed fact for submission to the jury on the issue of whether evidence was illicitly obtained. The only disputes were whether Bates had already been placed in custody at the time of his statement(s) and whether the protections of *Miranda* were implicated. Whether a person is in custody, for purposes of *Miranda* and Article 38.22, is a legal question and not a factual one. *See State v. Saenz*, 411 S.W.3d 488, 495 (Tex. Crim. App. 2013) (trial court's findings "inadequate to make the ultimate legal determination of whether appellee was in custody at the time of the challenged statements."). A jury instruction under Article 38.23(a) is only required where there is a "disputed issue[] of fact . . . material to [appellant's] claim of a constitutional or statutory violation that would render evidence inadmissible." *Madden*, 242 S.W.3d at 509–10. It is only logical that the same requirement applies to a jury instruction required by Article 38.22, Section 7. *See Oursbourn*, 259 S.W.3d at 176–77. No fact issue having been raised by the evidence, a jury instruction pursuant to Article 38.22, Section 7, or Article 38.23 was not required.

[18]Strictly speaking, we could deem Bates' point of error multifarious; he raises several grounds within this single point of error, and some grounds have multiple parts. A point of error that embraces more than one specific ground of error is multifarious. *See Bell v. Tex. Dep't of Crim. Justice–Institutional Div.*, 962 S.W.2d 156, 157–58 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). If a point of error is multifarious, we could refuse to review it. *See id.*

22

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the defendant was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Ineffective assistance of counsel claims must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. *Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex. Crim. App. 2011).[19] Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697. "The record on direct appeal is frequently insufficiently developed to support a claim of ineffective assistance of counsel; the best way to make a sufficient record to support such a claim is by a hearing on a motion for new trial or a hearing on an application for writ of habeas corpus." *Jackson v. State*, 877 S.W.2d 768, 772–73 (Tex. Crim. App. 1994) (Baird, J., concurring). "When facing a silent record as to defense counsel's strategy, the court will not speculate as to defense counsel's tactics or guess what the reasons might be for taking or not taking certain actions." *Smith v. State*, 84 S.W.3d 36, 42 (Tex. App.—Texarkana 2002, no pet.) (citing *Jackson*, 877 S.W.2d at 771). Because the trial record is directed to the issues of guilt or innocence and punishment, an additional record focused specifically on the conduct of counsel, such as a record of a hearing on a motion for new trial asserting ineffective assistance of counsel, is generally needed. *Kemp v. State*, 892 S.W.2d 112, 115 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Only when "counsel's ineffectiveness is

---

[19]However, we may consider multifarious points of error if we can determine, with reasonable certainty, the alleged error about which complaint is made. *See id.* at 157 n.1. Because we are able to determine the errors about which Bates complains, we will, in the interest of justice, consider his complaints.

so apparent from the record" will an appellant prevail on direct appeal absent a hearing on a motion for new trial asserting an ineffective assistance of counsel claim. *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003); *Kemp*, 892 S.W.2d at 115.

## A.  Failure to Object to Witness Testimony

Bates' first allegation of ineffective assistance is based on trial counsel's failure to object to the testimony of Police Officer Johnny Bangs (due to the omission of Bangs' name from the State's witness list) and to the testimony of Police Officer Shawn Upchurch and of Dunagan (both of whom Bates now claims were allowed to testify as expert witnesses). Bates has not shown that he filed a motion for new trial, and there is no indication that Bates took any other action to secure trial counsel's explanation of her trial strategy or reasons for her acts and omissions with regard to these witnesses.

Bangs offered minimal testimony, describing only his response to an emergency call and his arrival at the scene. Through Bangs, the State offered State's Exhibit 3 (the audio/video recording from the patrol car driven by Bangs). Although Bangs was not identified on the State's witness list, we cannot say counsel's performance was deficient in failing to object to this omission. The most significant part of Bangs' testimony was his sponsorship of the audio/video recording. When that recording was offered, trial counsel objected as noted earlier in this opinion. However, she expressed no surprise at or said nothing to suggest she was unaware of the existence of the audio/video recording, its contents, or the State's intent to offer it. In our deferential consideration of trial counsel's representation, we can easily conjure at least one valid strategic reason for not objecting to Bangs' testimony—counsel was fully aware that the State intended to

offer this recording into evidence. While we have found error in two aspects of the video, it could conceivably have had some evidentiary value, say, if the audio had not been admitted, but the video had. Bates has not satisfied the first *Strickland* prong with this allegation of ineffective representation.

Next, Bates complains that trial counsel failed to object to the testimony of Upchurch and Dunagan regarding the mechanical operation of a clutch on a standard transmission vehicle (characterizing this as expert testimony).[20] Bates has provided no authority to support the proposition that testimony about operating the clutch on a standard transmission vehicle requires expert testimony. Upchurch and Dunagan each based their testimony on their personal experience with vehicles, and both men testified that they had worked in or run automobile repair garages. A non-expert, or lay, witness may offer testimony based on his personal knowledge or experience. *See Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). Bates has not shown that either witness offered testimony based on "scientific, technical, or other specialized knowledge" that would "help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Because we cannot conclude that either of these witnesses offered expert testimony or that there was any error in the admission of their testimony, we find that Bates has not shown counsel to have been deficient in failing to object.

Upchurch testified that he believed Bates' ramming of the porch was an intentional act. Dunagan testified that the operator of a standard-shift vehicle could not accidentally shift gears

---

[20]The State had to prove Bates intentionally rammed Whitlock's porch; Bates' defense was that the collision was an accident. The State elicited testimony about engaging the clutch, versus releasing it, on vehicles with standard transmissions to establish that if the clutch were quickly released, the vehicle would come to a sudden stop.

from neutral to first gear and from reverse to first gear in Bates' truck (which Dunagan said he had ridden in multiple times). "'While a witness cannot possess personal knowledge of another's mental state, he may possess personal knowledge of facts from which an opinion regarding mental state may be drawn. The jury is then free to give as much or as little weight to the opinion as it sees fit.'"[21] *Solomon v. State*, 49 S.W.3d 356, 364 (Tex. Crim. App. 2001) (quoting *Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997)). Lacking any indication of trial counsel's strategy, we will not find that she rendered deficient representation based on the record before us.

**B.      State's Closing Argument**

In its rebuttal to Bates' closing argument, the State said, "We could have called other witnesses. We could have called neighbors. We could have called Mr. Duncan. Would it have changed anything?" The State also said, "And if the accelerator was stuck wouldn't there have been physical evidence to support that?" Bates argues that these statements were impermissible bolstering by the State and that trial counsel was ineffective in failing to object.

Bates' defensive theory at trial was that his truck malfunctioned and that the collision was an accident resulting from that malfunction. In closing argument, Bates' trial counsel stressed this causal theory. The State's arguments mentioned above could be considered rebuttal argument made in response to Bates' argument or deductions from or summary of the evidence. *See Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). Counsel could have believed these

---

[21]Additionally, testimony that after the first collision, Bates backed up and hit the porch a second time, then attempted to back up again supports an inference of intentional act.

26

comments to be unobjectionable; without anything in the record to demonstrate this was not a reasonable strategy, we will not find deficient performance.

### C.  Failure to Object to Testimony

Bates also complains of trial counsel's failure to object to other witness testimony. He claims there should have been an objection lodged when Upchurch testified that in his experience investigating drivers who had struck pedestrians, the driver typically "check[s] on the welfare of the victim." This statement appears to have been based on Upchurch's personal experience. Bates seems to argue that this testimony was objectionable because Upchurch did not speak to Bates at the scene. However, Officer Brakebill testified that Bates told him he did not try to assist Whitlock because Bates himself was injured or knocked unconscious by the collision. Bates points to testimony of Whitlock and Dunagan, who testified that someone removed Bates from the truck and assisted him to sit on Dunagan's porch. At most, these were conflicts in testimony, conflicts for resolution by the jury. We do not see how counsel was ineffective for failing to object. Bates also complains that the State, in closing arguments, stressed this inconsistency. The State argued, with the portion about which Bates complains in italic, as follows: "He backed up and tried to do it again. *Then he gets out -- he intentionally turns off the car. He intentionally opens the door. He intentionally ignores Mr. Whitlock. He intentionally leaves away from Mr. Whitlock.*[22] *And the police are called.*" (Emphasis added). In the context of the State's argument, this was a

---

[22]*See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (acts, words, or conduct of defendant may be considered and intent inferred therefrom).

reasonable deduction from, or summary of, the argument. Counsel cannot be faulted for failing to lodge an objection.

### D. Failure to Object to Leading Questions

Bates next complains of numerous instances of the State's posing leading questions to its own witnesses. Although leading questions are objectionable, sound trial strategy may dictate that the practitioner refrain from lodging such objections. *See Young v. State*, 10 S.W.3d 705, 712, 713 (Tex. App.—Texarkana 1999, pet. ref'd).

We also point out that in considering all of the above complaints, we can find nothing that establishes a reasonable probability that but for these alleged deficiencies, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694.[23]

Bates also complains the cumulate effect of the errors that he claims were made by trial counsel denied Bates a fair trial. We have found no error (or at least no error in light of our deferential review of trial counsel's performance) in the trial representation received by Bates. "[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); s*ee also Rodriguez v. State*, 336 S.W.3d 294, 303 (Tex. App.—San Antonio 2010, pet. ref'd) (because "appellant did not meet her burden of establishing individual instances of ineffective assistance of counsel, we hold that she cannot show an adverse cumulative effect from the actions of trial counsel").

---

[23]Although Bates' complaints address incidents at the guilt phase of trial, we observe that despite being convicted of a second degree felony and proof of an enhancing prior conviction, Bates was only sentenced to ten years' confinement, well within the lower range of the punishment that he could have been assessed.

We overrule Bates' point of error complaining he received ineffective representation of counsel at trial. The trial court's judgment and sentence are affirmed.

Bailey C. Moseley
Justice

CONCURRING OPINION

I agree with the majority's conclusion that Bates' conviction and sentence should be affirmed and that any error in admitting his statements was harmless. Because the State asserts *Bartlett v. State* as authority for its position that Bates was not in custody at the time he made the statements in question, I am writing to more fully explain why I believe that the statement "a valid investigative detention, which is characterized by lesser restraint than an arrest, does not constitute custody" goes too far in this case. *Bartlett v. State*, 249 S.W.3d 658, 668 (Tex. App.—Austin 2008, pet. ref'd).

I.      **Introduction**

My disagreement with this statement from *Bartlett* arises from the intermingling of the law involving investigative detention, as contemplated by *Terry v. Ohio*, 392 U.S. 1 (1968),[24] with the

---

[24]Although the phrase "investigative detention" is not found in the *Terry* opinion, it has evolved into a phrase synonymous with *Terry* stops. *See generally United States v. Sharpe*, 470 U.S. 675, 718 (1985) (Brennan, J., dissenting), where the phrases "*Terry* encounters," "*Terry* stops," and "investigative detentions" are used interchangeably to describe the same event.

concept of custody, as contemplated by *Miranda*. To some extent, the intermingling is a result of terminology. As explained below, the term "investigative detention" invokes the Fourth Amendment prohibition against unreasonable search and seizure, while *Miranda* deals with the Fifth Amendment privilege against self-incrimination. Often, courts deciding the issue of whether *Miranda* warnings were required in a particular circumstance have spoken in terms of whether incriminating statements were the product of "investigative detention" or custodial interrogation.[25] Since *Miranda* only involves the question of whether an incriminating statement was made as a result of non-custodial or custodial interrogation, the use of the term "investigative detention" in this concurrence refers only to how the term is understood in the Fourth Amendment context.[26]

---

[25]In *Dowthitt*, the Texas Court of Criminal Appeals wrote, "We have outlined at least four general situations which may constitute custody. . . . Concerning the first through third situations, *Stansbury* [*v. California*, 511 U.S. 318 (1994),] indicates that the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Citing to this language, several court have intermingled *Terry* with *Miranda* and have concluded that an investigative detention is not custody. *Ramirez v. State*, 105 S.W.3d 730, 738–39 (Tex. App.—Austin 2003, no pet.); *Loris v. State*, Nos. 02-11-00464-CR, 02-11-00465-CR, 02-11-00466-CR, 2013 WL 3968079, at *3 n.4 (Tex. App.—Fort Worth Aug. 1, 2013, pet. ref'd) (mem. op., not designated for publication); *Caballero v. State*, No. 05-11-00367-CR, 2012 WL 6035259, at *4 (Tex. App.—Dallas Dec. 5, 2012, pet. ref'd) (mem. op., not designated for publication); *Gonzalez v. State*, No. 10-04-00164-CR, 2005 WL 1836939, at *2–3 (Tex. App.—Waco Aug. 3, 2005, pet. ref'd) (mem. op., not designated for publication); *see Ard v. State*, 418 S.W.3d 256, 262 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Certainly, a *Terry* investigative detention can involve increasing restraint that leads to a person being in custody, but the investigative detention does not become custody. However, because neither *Dowthitt* nor *Stansbury* involved a Fourth Amendment issue, the term "investigative detention," as used in *Dowhitt*, did not have the same meaning as a *Terry* investigative detention.

[26]By using the terms "investigative detention" and "custody" to mark the two ends of the Fifth Amendment custody scale, courts effectively merge the two concepts when they should remain separate. As will be explained more fully below, the unintended consequence of this merger is that it allows the expansion of *Terry* to impermissibly encroach upon the protections of *Miranda*. A more accurate description would be to delineate between non-custodial encounters and custody under the Fifth Amendment and between investigative detentions and arrests under the Fourth Amendment. Nevertheless, the cases which frame the issue as a distinction between investigative detentions and custody are legion. Thus, to discuss the issue here, it is necessary to use that investigative detention/custody framework. Nevertheless, the use of the term investigative detention when discussing the Fifth Amendment should be interpreted as a non-custodial encounter under *Miranda* rather than a Fourth Amendment stop under *Terry*.

To explain why the statement in *Bartlett*—that "a valid investigative detention, which is characterized by lesser restraint than an arrest, does not constitute custody"—goes too far, it is necessary to review the definition of "custody" under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. In *California v. Beheler*, 463 U.S. 1121 (1983), the Supreme Court stated,

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving of *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

*Id.* at 1125. According to this definition, there are two types of custody under *Miranda*, "formal arrest custody" and "restraint on freedom of movement custody," or "restraint custody," for short. No controversy exists regarding the interplay between formal arrest custody under *Miranda* and "investigative detentions" under *Terry*; a person is clearly in custody under *Miranda* when he has been formally arrested under the Fourth Amendment. Yet, the interplay between investigative detention and restraint custody is more problematic.

Two competing perspectives have arisen among courts regarding the relationship between restraint custody under *Miranda* and investigative detention under *Terry*. Courts adhering to the first perspective believe *Miranda* restraint custody exists somewhere between investigative detention and formal arrest on the same continuum as Fourth Amendment seizures. Under this view, which considers investigative detention, custody, and formal arrest as representing different degrees of restraint, courts find that restraint custody under *Miranda* and investigative detention under *Terry* cannot occur at the same time.[27] Courts adhering to the second perspective believe

---

[27]*See United States v. Knox*, 839 F.2d 285, 296 (6th Cir. 1988) (Jones, J., concurring) (concluding "since a valid *Terry* seizure is, by definition, not a 'full seizure'—a term synonymous with 'arrest'—a person properly seized on reasonable

31

that seizure under the Fourth Amendment and custody under *Miranda* are not on the same continuum, but are separate concepts which typically, though not always, overlap.[28]  Under this perspective a person can be in custody during an investigative detention.[29]

*Bartlett* adhered to the first perspective.  In *Bartlett*, when the court of appeals stated that "a valid investigative detention . . . does not constitute custody," then logically, it concluded that one cannot be in custody during an investigative detention.  Because a person under formal arrest is in custody, and because an investigative detention is not a formal arrest, then formal arrest custody and investigative detention are mutually exclusive.  To the extent this statement from *Bartlett* is limited to *formal arrest* custody, I have no disagreement.  Yet, the State offers *Bartlett* as authority for the conclusion that one cannot be in *restraint* custody during an investigative detention.  For the reasons set forth below, I believe that one can be in restraint custody during an

---

and articulable suspicion for a brief investigatory detention could never be considered 'in custody' so long as the scope and duration of the *Terry* stop do not exceed the underlying justification"); *see also United States v. Manbeck*, 744 F.2d 360, 379 n.30 (4th Cir. 1984) ("[T]here are two types of seizures, one a permissible investigative stop, the second a detention equivalent to arrest.  The Supreme Court has implied that custodial interrogations and *Terry* stops are mutually exclusive, i.e., if one is interrogated in a custodial situation the limits of *Terry* have necessarily been exceeded. . . . The type of 'seizure' that is similar to 'custody,' then, is seizure equivalent to arrest." (citation omitted)).

[28]*See United States v. Newton*, 369 F.3d 659, 673–74 (2d Cir. 2004) (recognizing debate among federal courts and citing cases that reached opposite conclusions on same question); *see also United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007) (holding "although some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which *Miranda* was designed to operate"); *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) (holding defendant was in custody under *Miranda* while being detained under *Terry*).

[29]If custody and investigative detention are mutually exclusive, then logically, they must exist on the same continuum because their exclusivity depends upon their relationship to each other.  To use an analogy, under the first perspective, if the two concepts are mutually exclusive, then one cannot exist in both states of restraint at the same time, just as one cannot stand up while sitting down.  The existence of one state requires the non-existence of the other state.  On the other hand, a person can talk while standing or talk while sitting.  The existence of speech does not require the non-existence of a person's body position.  Thus, the first perspective views restraint custody and investigative detentions on the same continuum, whereas the second perspective does not.

investigative detention.  Therefore, I believe the statement in *Bartlett*, because it is not expressly limited to formal arrest custody, goes too far for application to the present case.[30]

## II.    *Berkemer v. McCarty* and the Effect of Permitting Increased Restraint During Investigative Detention on the Custody/Investigative Detention Analysis

As noted by the majority, the court of appeals in *Bartlett* relied on *Berkemer v. McCarty*, 468 U.S. 420 (1984), as authority for its conclusion that "a valid investigative detention . . . does not constitute custody."  *Bartlett*, 249 S.W.3d at 668.  In that case, an Ohio state trooper stopped Berkemer after observing his car weaving in and out of the traffic lanes and subsequently arrested him for driving while under the influence after he failed a field-sobriety test.  *Id.* at 423.  Berkemer made incriminating statements both on the roadside prior to his arrest and then again at the jail. *Id*.  Yet, he was never administered the *Miranda* warnings at either location.  *Id*. at 424.  The Supreme Court first noted that "[t]here can be no question that [Berkemer] was 'in custody' at least as of the moment he was formally placed under arrest and instructed to get into the police

---

[30]Noting that this case only involves the admissibility of Bates' statements under the Fifth Amendment, and not the admissibility of tangible evidence seized under the Fourth Amendment, it could be said that the State's reliance on *Bartlett* is misplaced because *Bartlett* discusses Fourth Amendment seizure law, not Fifth Amendment custody law. Yet, this fact highlights the issue addressed here.  *Bartlett* may have discussed Fourth Amendment law, but it was a Fifth Amendment case.  Clearly, Fifth Amendment custody and Fourth Amendment seizure are separate analyses. Yet, there is no conceptual difference between an arrest under the Fourth Amendment and an arrest under the Fifth Amendment:  a person is just as much under arrest either way.  Consequently, the Fourth Amendment seizure and Fifth Amendment custody analyses converge at the point of arrest.  The issue is whether seizure and custody converge only at that point or whether they also co-exist on the same continuum at all other points less than arrest.

If the states of custody under the Fifth Amendment exist on the same continuum as the states of seizure under the Fourth Amendment at all points from investigative detentions to arrest, and if an investigative detention is not custody, then a finding that Bates was in an investigative detention under *Terry* would negate a finding that he was in custody under *Miranda*.  That is the State's position here:  no *Miranda* warnings were required because Bates was not in custody, and Bates was not in custody because he was merely in an investigative detention under *Terry*.  But if custody and seizure are separate considerations that only converge at the point of arrest but remain separate at all other points, and if the holding that an investigative detention is not custody means only that an investigative detention is not formal arrest custody, then we would need to evaluate whether Bates was in restraint custody under *Miranda* regardless of whether he was merely being detained under *Terry*.

33

car." *Id*. at 434. The Court then held that because the roadside stop was similar to the brief investigative detention authorized by *Terry*, Berkemer was not in custody for purposes of *Miranda* until he was formally arrested. *Id*. at 442. Accordingly, the Supreme Court held that Berkemer's statements made during the roadside stop were admissible, but his statements made at the police station were not. *Id*.

Thus, *Berkemer* clearly demonstrated that formal arrest under the Fourth Amendment and formal arrest custody under *Miranda* are the same, but in explaining why Berkemer's roadside statements were admissible, the Supreme Court seemed to draw a bright line distinction between *Terry* stops and *Miranda* custody.

> [T]he usual traffic stop is more analogous to a so-called "*Terry* stop" than to a formal arrest. . . . The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Id*. at 439–40 (citations omitted). The Supreme Court went on to say,

> No more is implied by this analogy than that most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*. We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop.

*Id*. at 439 n.29. Finally, the Supreme Court noted, "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections provided by *Miranda*." *Id*. at 440. Consequently, the Supreme Court seemed to hold that custody and investigative detention are on

34

the same continuum so that a person cannot be under investigative detention as defined by *Terry* and in custody under *Miranda* at the same time.[31]

Yet, because the roadside detention in *Berkemer* was not very intrusive, it does not appear that restraint custody under *Miranda* was ever considered. Moreover, the degree of restraint permitted in *Terry* stops has increased significantly since *Berkemer* was decided. As noted by the United States Court of Appeals for the Tenth Circuit,

> The last decade, however, has witnessed a multifaceted expansion of *Terry*. Important for our purposes is the trend granting officers greater latitude in using force in order to 'neutralize' potentially dangerous suspects during an investigatory detention. . . . Thus, today, consonant with this trend, we held that police officers acted reasonably under the Fourth Amendment when they, without probable cause and with guns drawn, stopped Mr. Perdue's car, forced him to get out of his car, and demanded that he lie face down on the ground.

*Perdue*, 8 F.3d at 1464.[32] Consequently, *Berkemer* did not resolve the issue of whether there could be an investigative detention so intrusive that it significantly restrained a person's "'freedom of

---

[31]In *Florida v. Royer*, the Supreme Court appeared to suggest the same conclusion:

> What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had Royer's ticket, they had his identification, and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained. At least as of that moment, any consensual aspects of the encounter had evaporated, and we cannot fault the Florida Court of Appeal for concluding that *Terry v. Ohio* and the cases following it did not justify the restraint to which Royer was then subjected. As a practical matter, Royer was under arrest.

*Florida v. Royer*, 460 U.S. 491, 503 (1983); *see also Howes v. Fields*, 132 S.Ct. 1181, 1190 (2012) ("[T]he 'temporary and relatively nonthreatening detention involved in a traffic stop or a *Terry* stop does not constitute *Miranda* custody.'") (quoting *Maryland v. Shatzer*, 130 S.Ct. 1213, 1224 (2010) (citation omitted)). Other courts have reached this conclusion as well. *See* cases cited *supra* note 24.

[32]In *Berkemer Revisited: Uncovering the Middle Ground Between* Miranda *and the New* Terry, 77 FORDHAM L. REV., 2779, 2795–2811 (2009), the author traces the expansion of *Terry* from its origin in response to the racial tensions of the late 1960s, through the War on Drugs of the 1980s and 1990s, to post-9/11 America, noting,

movement' of the degree associated with formal arrest" such that it would constitute restraint custody and investigative detention at the same time.

## III. Factors Supporting a Separate Analysis of Custody and Investigative Detentions

If restraint custody and investigative detention are on the same continuum and, therefore, mutually exclusive, and if an investigative detention is not a formal arrest requiring probable cause, then logically, as the scope of permissible intrusiveness under *Terry* increases, the scope of restraint custody under *Miranda* must decrease. On the other hand, if restraint custody and investigative detentions are separate states of existence that typically overlap, then permissible restraint under *Terry* can expand to the edge of formal arrest, yet leave room for restraint custody to co-exist. There are three reasons why the second conclusion should prevail over the first.

### A. The *Miranda* Warnings Requirement and the *Terry* Investigative Detention Exception Were Adopted to Accomplish Different Goals

First, the determination of whether a seizure is an investigative detention under *Terry* rather than an arrest under the Fourth Amendment, and the determination of whether a person is in

---

Beginning around the time of *Berkemer*, appellate courts seized on this rationale to condone more intrusive police practices under *Terry* that would help police officers more effectively investigate their suspicion without converting the detention into an arrest. Justified in large part by an officer's interest in ensuring his own protection and preventing a suspect's flight during a *Terry* stop, most circuits today have approved police use of drawn weapons or handcuffs to restrain criminal suspects. Courts have also permitted police to demand a suspect to lay prostrate on the ground during a stop and frisk search. In addition, courts have allowed police to forcibly transport suspects (most notably to a patrol car) under a valid *Terry* stop.

As a result, lower courts, while maintaining that *Terry* remains a limited exception, have authorized conduct similar to that associated with custodial arrest without converting that stop into a full-fledged arrest.

*Id.* at 2805 (citations omitted); *see also State v. Sheppard*, 271 S.W.3d 281, 289 n.28 (Tex. Crim. App. 2008) (holding "a Fourth Amendment *Terry* detention is not a custodial arrest, and the use of handcuffs does not automatically convert a temporary detention into a Fourth Amendment arrest").

restraint custody for purposes of *Miranda*, are clearly separate analyses with clearly separate goals.

The "inquiry into the circumstances of temporary detention for a Fifth and Sixth Amendment *Miranda* analysis requires a different focus than that for a Fourth Amendment *Terry* stop. . . . The purpose of permitting a temporary detention without probable cause or a warrant is to protect police officers and the general public. *United States v. Smith*, 3 F.3d 1088, 1096, 1097 (7th Cir. 1993). By contrast, "the basis for [the *Miranda*] decision was the need to protect the fairness of the trial . . . ." *Schneckloth v. Bustamonte*, 412 U.S. 218, 240–41 (1973). In *Schneckloth*, the Supreme Court went on to say,

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed by the Fourth Amendment. . . .
>
> . . . .
>
> The Fourth Amendment "is not an adjunct to the ascertainment of truth." The guarantees of the Fourth Amendment stand "as a protection of quite different constitutional values— values reflecting the concern of our society for the right of each individual to be let alone." . . .
>
> . . . .
>
> . . . . The considerations that informed the Court's holding in *Miranda* are simply inapplicable to the present case.

*Id.* at 241–42, 246. Accordingly, as more sophisticated weapons are developed, and particularly in the age of terrorism, it stands to reason that officer and public safety would spur increasing restraint in investigative detentions. By contrast, to suggest that less fairness or truth would ever be acceptable in a trial or proceedings leading to trial would be absurd.

**B.** **The Differences Between the Exceptions to the Fourth And Fifth Amendments Were Based on a Balance of Competing Interests by the Constitution's Framers, and Reviewing the Concepts Together Would Upset that Balance**

Second, even though the privacy interests protected by the Fourth and Fifth Amendments overlap, the exceptions to their protections are significantly different and inapplicable to each other. *Fisher v. United States*, 425 U.S. 391, 400 (1976). For instance, although a grant of immunity by the State will overcome the Fifth Amendment privilege, immunity will not overcome the Fourth Amendment right against unreasonable and warrantless searches and seizures. *Id.* On the other hand, the Fourth Amendment right may be overcome by a warrant, probable cause, or reasonableness, whereas the Fifth Amendment privilege cannot. *Id.* Essentially, under the Fourth Amendment, the State may have both the evidence and the prosecution, but under the Fifth Amendment, the State must choose between having the testimony and having the prosecution.[33] The Supreme Court noted that these distinctions were not incidental, but were carefully crafted into the Bill of Rights by the Constitution's framers:

> They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue. They did not seek in still another Amendment[—]the Fifth[—]to achieve a general protection of privacy but to deal with the more specific issue of compelled self-incrimination.

*Id.* Therefore, logic dictates that under *Fisher*, any attempt to engraft the Fourth Amendment exceptions onto the Fifth Amendment right against self-incrimination would be unconstitutional.

---

[33]*See Lefkowitz v. Turley*, 414 U.S. 70, 79 (1973) ("[T]he price for incriminating answers from third-party witnesses is sufficient immunity to satisfy the imperatives of the Fifth Amendment privilege against compelled self-incrimination.").

As noted previously, it is easy to contemplate situations where an investigative detention might require significant restraint on freedom of movement that would be reasonable under the circumstances, and therefore, permissible under the Fourth Amendment. As also noted, no such balancing process was included with respect to the Fifth Amendment right against self-incrimination. Yet, if restraint custody and investigative detention are mutually exclusive, then expanding the definition of investigative detention under *Terry* would necessarily contract the definition of restraint custody under *Miranda*. If the expansion of *Terry* is justified by reasonableness, then the corresponding contraction of *Miranda* is also a product of reasonableness. Yet, reasonableness is not an exception to the Fifth Amendment and *Miranda*. Thus, contracting *Miranda*'s definition of restraint custody in order to accommodate expansion of investigative detention under *Terry* would effectively allow Fourth Amendment reasonableness to invade into the Fifth Amendment's restraint custody analysis.

C. **The Supreme Court Contemplated that *Terry*'s Investigative Detention Exception Might Expand, but it Intended *Miranda*'s Requirements to Remain Constant**

Finally, language from the Supreme Court's opinions themselves supports the conclusion that expansion of permissible restraint used in *Terry* investigative detentions would be allowed, whereas the definition of restraint custody under *Miranda* would remain constant. In *Terry*, the Supreme Court expressly left it to later cases and courts to identify the boundaries of permissible restraint in investigative detentions.

> We need not develop at length in this case . . . the limitations which the Fourth Amendment places upon a protective seizure and search for weapons. These limitations will have to be developed in the concrete factual circumstances of individual cases. . . . The sole justification of the search in the present situation is

39

> the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*Terry*, 392 U.S. at 29 (citations omitted). By contrast, the Supreme Court has ruled that "'[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the [*Miranda*] decision'" are clearly present. *Howes*, 132 S.Ct. at 1192 (quoting *Berkemer*, 468 U.S. at 437). Accordingly, the ceiling above permissible restraint in an investigative detention has been raised, but the floor beneath restraint custody under *Miranda* has not moved with it. Not surprisingly, as the investigative detention ceiling rises, situations have arisen where the restraint used in an investigative detention becomes so great that what may have started as a non-custodial encounter becomes restraint custody under *Miranda*. This is exactly what the Court observed in *United States v. Perdue*:

> One cannot ignore the conclusion, however, that by employing an amount of force that reached the boundary line between a permissible *Terry* stop and an unconstitutional arrest, the officers created the "custodial" situation envisioned by *Miranda* and its progeny.

*Perdue*, 8 F.3d at 1464.

## IV. Texas Cases Considering This Issue

The Court of Criminal Appeals does not appear to have addressed this issue specifically.

In *Dowthitt v. State*, the court held that there are

> at least four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. Concerning the first through third situations,

40

> [*Stansbury v. California*, 511 U.S. 318 (1994)] indicates the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention.

*Dowthitt v. State*, 931 S.W.3d 244, 255 (Tex. Crim. App. 1996) (citation omitted). On first glance, this language suggests that the Court views custody on the same continuum as investigative detentions, yet, neither *Dowthitt* nor *Stansbury* involved a Fourth Amendment issue, and, as in *Berkemer*, it does not appear the Court considered restraint custody during the course of an investigative detention. Moreover, *Dowthitt* was decided prior to the escalation of restraint in investigative detentions observed by the Tenth Circuit Court of Appeals in *Perdue*.

In *State v. Ortiz*, the Tenth Court of Appeals clearly considered the issues separately, holding that the determination of "whether handcuffing [the defendant] placed him in custody for *Miranda* purposes does not turn on the reasonableness, under the Fourth Amendment, of [the officer's] decision to handcuff him for officer safety. The two inquiries are related but they are not the same." *State v. Ortiz*, 346 S.W.3d 127, 133 (Tex. App.—Amarillo 2011), *aff'd*, 382 S.W.3d 367, 374 (Tex. Crim. App. 2012). The Court of Appeals went on to say that "[a] conclusion Ortiz was in custody under *Miranda* when he was handcuffed means neither that he actually was under arrest nor that Johnson's stated concerns for officer safety were unreasonable, under a Fourth Amendment analysis." *Id*. The Court of Criminal Appeals affirmed the lower court's decision, noting

> A normal traffic stop is a non-custodial detention because it is brief and relatively non-coercive. In holding that a traffic stop is generally less coercive than a custodial detention, the *Berkemer* Court observed that, during a traffic stop, a detainee is typically "only confronted by one or at the most two policemen[, which] further mutes his sense of vulnerability." By the time he made the cocaine statements in this case, however, the appellee's detention had escalated into

something inherently more coercive than a typical traffic stop. . . . While this is hardly an overwhelming show of force, it adds at least marginally to the court of appeals' [] conclusion that the appellee was in custody for *Miranda* purposes at that time.

*Ortiz*, 382 S.W.3d at 374 (citations omitted). Nevertheless, the Court of Criminal Appeals did not specifically adopt the lower court's reasoning that investigative detentions and custody are separate analyses even though it affirmed the lower court's ultimate conclusion. Yet, its reasoning that Ortiz' original "typical traffic stop" had escalated into an "inherently more coercive" "[investigative] detention" that constituted *Miranda* custody is not inconsistent with the lower court's reasoning.

Subsequently, in *Estrada v. State*, No. PD-0106-13, 2014 WL 969221 (Tex. Crim. App. Mar. 12, 2014) (not designated for publication),[34] the Court of Criminal Appeals distinguished *Ortiz* and held, in an unpublished opinion, that the defendant was not in custody during the course of a traffic stop.

> In the end, Estrada can identify only one circumstance that might lead a reasonable person to consider himself in custody for *Miranda* purposes: the fact that Officer Rodriguez asked Estrada and her passenger whom the drugs belonged to. Every other factor identified by this Court and the court of appeals—that Estrada was not handcuffed; that she was not subjected to a pat-down; that the "ordinary" number of police vehicles and officers were present during her detention; that she was not informed that she was not free to leave; and that she was not separated from her passenger and interrogated individually—indicate that the stop was a simple investigative detention and never rose to the level where a reasonable person would consider himself in custody.[35]

---

[34]While Rule 77.3 of the Texas Rules of Appellate Procedure prohibits the citation of unpublished Texas Court of Criminal Appeals opinions as authority, they "can be cited to demonstrate conflict among the courts of appeals or to demonstrate how [the Texas Court of Criminal Appeals] and other courts have interpreted and applied constitutional law." *Ex parte Denton*, 399 S.W.3d 540, 553 n.30 (Tex. Crim. App. 2013) (orig. proceeding) (Keller, P.J., concurring); *see* TEX. R. APP. P. 77.3.

[35]In other words, the Court determined that the officer's interrogation remained non-custodial.

42

*Id.* at *5. More importantly, the Court of Criminal Appeals rejected Estrada's argument that "'[a]ccording to *Berkemer*, at the time Officer Rodriguez posed his question to Ms. Estrada, this encounter was no longer an investigative detention' because the only purpose of his question was to obtain an incriminating response." *Id.* The court held,

> *Berkemer* does not stand for such a proposition. In *Berkemer*, the Court indicated that a non-custodial, investigative detention will typically involve "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." This statement does not limit questions asked during an investigative detention to non-incriminating ones. The fact that an officer is authorized to ask questions for the purpose of confirming or dispelling his suspicions assumes that such questions could be potentially incriminating. Ultimately, the Supreme Court in *Berkemer* stated that a determination of custody turns on whether a detainee's freedom is curtailed to a degree associated with formal arrest, the test this Court and the court of appeals have applied to this case.

*Id.* (citations omitted). The Court of Criminal Appeals once again focused the issue on the amount of restraint involved, not on whether the existence of an investigative detention rendered custody impossible.

Given its prior holding in *Sheppard* that "a Fourth Amendment *Terry* detention is not a custodial arrest, and the use of handcuffs does not automatically convert a temporary detention into a Fourth Amendment arrest," the Court's reasoning in *Ortiz* suggests that the Court would conclude that custody and seizure are separate analyses in an appropriate case. *Sheppard*, 271 S.W.3d at 289 n.28. On the other hand, one reading of *Dowthitt* and *Estrada* might suggest that the Court considers them on the same continuum. Yet, despite the use of the term "investigative detention" in *Dowthitt* and *Estrada*, nothing suggests that the Court considers a Fourth

43

Amendment *Terry* detention on the same continuum as Fifth Amendment custody. In any event, the issue does not appear to have been conclusively clarified by the Court of Criminal Appeals.

## V.    Application to the Present Case

In the present case, it is clear that Bates was in custody when he was handcuffed and placed into the back seat of the patrol car. The fact that he was not formally arrested until approximately eleven minutes later does not change the fact that he was in custody because he was under "'restraint on freedom of movement' of the degree associated with a formal arrest.'" *Beheler*, 463 U.S. at 1125. Yet, as demonstrated above, it is also possible he was being held in an investigative detention until formally arrested, and the State is not without support from the record to make that argument. Although a witness said Bates "tried to kill that man," viewing the scene objectively at the time the officers arrived, the position of Bates' vehicle was just as consistent with an accident or mechanical failure as it was with an intentional act. Only after obtaining more information were the officers able to develop probable cause to arrest him for aggravated assault with a deadly weapon. Likewise, the presence of the shirtless man, his agitated state, and his statements that the officers better "[g]et him" because he was "gonna do something stupid" would have justified the officers placing Bates in handcuffs and securing him in the patrol car in order to prevent the situation from escalating into further violence until they could obtain more information. And *Bartlett* supports the State's argument that Bates was merely being detained, at least when he was initially handcuffed and placed in the patrol car. Nevertheless, even if the State was correct in asserting that Bates was merely being detained under *Terry*, it does not require a finding that he was not also in custody under *Miranda*.

44

Consequently, the Court of Appeals' statement in *Bartlett* is correct insofar as it addresses formal arrest custody. Because formal arrest custody and formal arrest are the same, and because an investigative detention is not formal arrest, then "a valid investigative detention, which is characterized by lesser restraint than an arrest, does not constitute [formal arrest] custody." *Bartlett*, 249 S.W.3d at 668. Yet, as has been shown above, the statement goes too far if applied to restraint custody. For these reasons, the State's reliance on *Bartlett* is misplaced. Because Bates was in restraint custody, *Miranda* warnings were required, and in the absence of warnings, the statements were inadmissible. Nevertheless, for the reasons noted by the majority, any error in admitting those statements was harmless.

Ralph K. Burgess
Justice

Date Submitted:     March 4, 2015
Date Decided:       June 17, 2015

Publish

45

## CERTIFICATE OF SERVICE

This is to certify that on September 25, 2015, a true and correct copy of the above and foregoing document was served on the County Attorney's Office, Lamar County, 119 N. Main, Paris, Texas 75460, by hand delivery, and to the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas by certified mail, return receipt requested.

/s/Gary L. Waite
Gary L. Waite

## CERTIFICATE OF COMPLIANCE

I certify that this Petition conforms to the requirements of TRAP 9, and consists of 1,428 words per TRAP 4(I) (2) (D).

/s/ Gary L. Waite
Gary L. Waite